Thank you, Your Honor. And then why don't we turn to our third case on the argument calendar today, which is 20-1287-AG, Argueta-Fuentes v. Merrick Garland. We'll let the parties come up and get settled at council table. All right, I think we have Mr. Pang for the appellant. Is that right? Yes, that's correct, Your Honor. And you would like to reserve two minutes for rebuttal, I understand. Yes, thank you, Your Honor. Please proceed. I'll take off my mask. So I suppose before jumping in, I just wanted to note, Judge Wesley, I know you have deep roots in Western New York. I wanted to know, I think, how our thoughts are with the community in Western New York on the track. Yeah, thank you very much. May it please the Court, John Pang on behalf of Petitioner Oscar Argueta-Fuentes. As this Court has long articulated, the United States Convention Against Torture Applications prohibit the removal of any individual to a country where it is more likely than not they would be subject to torture. In this case, the petitioner sought such mandatory protective relief. Stemming from a constellation of risks he faces as a young Salvadoran man who persistently resisted gang recruitment, who fled El Salvador under threats, and then who was later misidentified as an MS-13 gang member by U.S. law enforcement. In denying Mr. Argueta's claim, the agency committed several independently reversible legal errors, all centering in its fact-finding process. So I'd like to first address the agency's failure to consider and evaluate the likely torture Mr. Argueta faces from the government officials themselves, including the extermination squads that commonly target suspected gang members for extrajudicial killings, disappearances, and other forms of torture. So that's your first claim of error. Would you, in doing so, clarify the nature of the claim, whether it is that the exterminator squad is a governmental group or a non-governmental group that would be acting with the acquiescence, etc., of the government? What is the nature of your claim? Right. Your Honor, my reading of it is the exterminators are – they kind of cross both fields. They are composed of law enforcement officers, probably down-ranked police officers, law enforcement, who form these bands and then who do target extrajudicially the killings or disappearances of suspected gang members. So I do think there is an evaluation of whether that's under color of law, which distinguishes whether that's committed by a public official versus whether you need the acquiescence as well on top of that. So you're basically arguing it's both or that the agency should have considered it under both headings, that it could fall either way and therefore that there was enough evidence of it falling on either side of that line that the agency had to consider it both ways? Right. Your Honor, my view is it falls under the former, which is they are public officials acting under color of law. I think the agency's error was they didn't look at it one way or the other. And so if the agency looked at it, they needed to make that finding, is this under color of law or not? Do they need to do that or – my understanding, looking at the IJ's opinion, is that the evidence of the exterminator group was put forward, I think it was Exhibit 6 with a number of tabs, and that the IJ referenced that quite specifically in the IJ's opinion, saying Exhibit 6 has been marked, tabs A through U, I've considered all this evidence and on balance I find no, whatever it is, insufficient proof that the CAT standard is satisfied here. Why does an IJ have to be more specific in its findings? I mean, it seems to me that you're arguing that it's a lack of specificity in the articulation of the findings, but if the IJ says, look, I read Exhibit 6, we all know Exhibit 6 is all about the exterminators, it's got whatever the evidence you put in about either acquiescence or governmental involvement, why do we need anything more specific than that? Sure, just perhaps a quick clarification point. So Exhibit 6 was all the country conditions evidence the petitioner submitted, which consisted of many tabs, right, so it spanned kind of the actual evidence that was being considered. I think to Your Honour's point, this is a very specific part of the petitioner's claim, that he would be tortured in some respect, or faces the likelihood of torture from government officials. And so I do think that is a point where this Court has repeatedly said, IJ does not need to expressly parse every single bit of evidence, but they need to demonstrate that they have considered it in the totality. But he said he did. And I guess if you say, I've looked at everything, and then let me give you some detailed follow-up on some of what the IJ must have thought were the particularly, I don't know, perhaps the persuasive, like MS-13, it seems like then you're creating a disincentive for the IJ to be specific about certain topics, if we will, by negative implication, assume that anything the IJ did not then spend a paragraph on must have been ignored, even though the IJ said, I've looked at all the evidence, and lists the evidence. I mean, we're not going to assume he ignored tabs B through J when he said he looked at A through U. Right. Right. So what is it that allows us to think that the IJ didn't do what the IJ said had been done? Right. And so, Your Honor, I think this is partly, so the IJ provided the right standard, right? I think most opinions, immigration opinions, the IJ opens with, I have considered all the evidence presented. I think the proof is kind of in the pudding here, because if you look at the substance of the IJ's holding, whenever he talks about government officials, it's always about acquiescence. So for example, at 71 of the record, the IJ talks about the reports regarding government officials, and then the conclusory sentence is, in sum, I don't believe Mr. Ardueto will be tortured by MS-13 with the acquiescence of government officials, and that's in regards to corruption. But that's talking about MS-13. Right. Right. Not the exterminators. Right. I mean, I don't think anyone was claiming that MS-13 is the government, right? Well, I think there was some discussion about that, but the BIA did not address that. I'll also perhaps point to, I think, a more specific part of the record, 72. This is the final paragraph of the IJ's decision. He says, to sum up, I don't believe petitioner will be tortured, rising to the level required by CAT, by MS-13. And then he also says, that's including MS-13 or Barrio 18, the rival gang. He leaves out any discussion of intentional torture inflicted by the government officials themselves. And so I think that, in our estimation, does show the IJ. When he says, I looked at all the evidence. What about this line? Take, I guess this is page four of the IJ's opinion. In this case, respondent states that should he return to El Salvador, he will be targeted by the gangs operating in that country, which are themselves a de facto government. And that he could also be targeted for harm or harm rising to the level of torture by law enforcement authorities in that country that operate with a high level of impunity and a high level of corruption. That certainly sounds to me like that subsumes the exterminators. Right. And I guess, Your Honor, again, I think it's the head and tail kind of where the IJ announces that's what he's looking at. But then the conclusion to me suggests, I've looked at it, but I'm looking at this with the lens of, is this inflicted torture with the absences of the government, not torture committed by the government. And so I think maybe... But the standard's the same, right? I mean, if you're worried, the likelihood or the probabilistic analysis is, are the exterminators going to commit torture against them, right? And if the answer is no, then we don't really care whether it would... If it had... If it were to happen, it would either be with acquiescence or by the government itself. It's just not, as a factual matter, going to happen. Well, I suppose, Your Honor, I'd say this relates to another argument in our brief, which is the aggregation, the mis-aggregation of the claim. Because I do think that the IJ needs to address that to say, okay, if the exterminators would not, by themselves, commit torture, more likely than not, what about when I can combine everything? The prospective torture from MS-13, from Barrio 18, from the exterminators, from government officials, what happens when I consider it in the totality? And I think that's what he was required to do, and he did it. He said at each point, I'm looking at this on its own, and this on its own doesn't rise to the level. And then I'm looking at this on its own, and this one doesn't rise to the level required. And so I think even on that score, there would be a legal error that would be reflected. And I just should have made kind of a combined polling. I do see I'm over time, so I can... No, that's fine. You've held on to two minutes for rebuttal, so we'll see you back. Unless, again, Judge Robinson, did you have any questions at this point? No. Okay. We'll see you in a few minutes. Don't go away. Let's hear from the government. We have Mr. Ross. Is that right? Yes, Your Honor. Thank you. And good morning. Please proceed. Thank you again, Your Honors. May it please the Court. My name is Jonathan Ross, and I represent the Attorney General. Today, Mr. Agueda has the sizable burden to show that no reasonable adjudicator could have possibly denied his claim. And he fails to make that burden for two reasons. First, the immigration judge properly considered and aggregated Mr. Agueda's claim as a criminal non-citizen with alleged gang ties under a unitary risk umbrella. And when weighed with the mixed record evidence, was reasonable in determining that he failed to meet his burden to show that anyone in El Salvador, public or private, sought to harm him. Second, the immigration – rather, Mr. Agueda had – I'm sorry. Would you say that again? It was his burden to show that it was more likely than not, right? A clear probability, yes, Your Honor. A 51 percent chance. However, his burden today must show that no reasonable adjudicator could have denied his claim. And in aggregating his risk as a criminal non-citizen with alleged gang ties and the mixed record of evidence that contained anecdotal harm, but also other evidence of advances being made by the Salvadoran government and other private individuals in reducing gang violence, it was reasonable for the immigration judge to make – Counsel, there's a question. Can I ask, when you say that the question is whether no reasonable adjudicator could reach this, that sounds like a sufficiency of the evidence kind of argument. And as I understand the argument, it's less about what the adjudicator could do and more about what the adjudicator did, that this opinion suggests that there's an important element of the claim that was not incorporated into the adjudicator's analysis and that that would be a basis for remaining. Is that – what's the standard for evaluating that? Yes, Your Honor, and please allow me. I'll take it in part. So Mr. Arrueta needs to show that substantial evidence does not support the immigration judge's decision as affirmed by the board. The immigration judge, however, did consider all of the evidence as stated explicitly in the decision, but also through the presumption of administrative regularity and through no obligation to parse out every individual argument. Counsel, just – and maybe this is the same or different from what Judge Robinson is getting at, but isn't the argument that there was a legal error here, at least in part, which would take us out of the substantial evidence standard? And I get that. Your argument is that if we're looking at whether the substance is right, you look at substantial evidence. But if the question is instead, they didn't aggregate the harm, well, that could be a legal error, or they didn't articulate the findings with respect to a whole – a class of claimed injuries, that's a legal error. So could you – again, as Judge Robinson asked, could you tell us what is the standard of review for purported legal error? This Court reviews legal errors de novo. However, the immigration judge's purely factual determination as to whether someone faces a clear probability of torture is a factual question that this Court reviews for substantial evidence. Go ahead and finish your thought. I didn't mean to interrupt you. Go ahead. Thank you, Your Honor. With regard to Judge Robins' question, the question of aggregation in this case can be solved by looking at the why. The immigration judge, in aggregating the risk of torture, considered all of the possible actors that might seek to harm Mr. Agueda because he's a criminal, because he's a noncitizen returning, because he has alleged gang ties in various forms. So you're arguing that there was no legal error in the aggregation analysis here, that the mode of analysis was fine, and therefore all the petitioner's left to argue with is the substance of the aggregation. That's correct, yes, Your Honor. Now, turning to aggregation – Go ahead. That's where I wanted to go, aggregation. Tell me where we know that he considered all of the evidence. Well, it's stated explicitly in the four corners of the immigration judge's decision, but it's also clear implicitly that the immigration judge sincerely understood the core principles of Mr. Agueda's claim. He understood that he feared returning to El Salvador based on his past, based on his status as a convicted criminal, based on someone who's been recruited by gangs and someone who's alleged to be a gang member. Critically here, the – in the aggregation analysis, the immigration judge considered all of the why. And in evaluating everything under a unified umbrella of risk, he necessarily aggregated the case – the multiple risks of harm together. My distinguished colleague's contention that – suggestion that there is individual analysis of the risk is just simply not supported by the immigration judge's decision nor the Board's decision. The Board very clearly lays out the reasons, again, the why Mr. Agueda would risk harm in El Salvador at the hands of any actors, public or private. And on the note of public or private, it doesn't matter where the vigilante groups fall in that circle. In fact, my colleague has taken every length from even before the immigration judge at connecting that group to the government, even though Mr. Agueda's testimony at AR-140 specifically states that these are retired or former members of the government. But it really does not matter for the analysis and for this Court to deny the petition for review because the immigration judge now analyzed all sources, public and private. Also, with regard to the vigilante group, it's absolutely critical that – the vigilante group is an ancillary post hoc realization that Mr. Agueda raises. It was never mentioned at AR-477 in the – in his request for cap protection. Even before the immigration judge at AR-140, it's mentioned as an afterthought. In passing – I'm sorry. Which point was raised as an afterthought? I'm sorry, Your Honor. The vigilante group. The vigilante group. The vigilante group. The exterminators. The exterminators specifically as one vigilante group. At AR-140 and 141, not only is it mentioned as an afterthought, but his counsel doesn't ask any follow-up questions. Perhaps even most critically, the immigration judge's decision contains a reflection of the extent to which the vigilante group was made part of his claim. In dozens of pages of testimony before the immigration judge, he talks about gangs, gangs, gangs, gangs in some government. But at any rate, this Court presumes a level of regularity in the underlying proceedings. But this case goes far beyond that because the four corners of the immigration judge's decision makes clear that he considered all of the evidence as affirmed by the Board. It's also worth noting that there's no evidence in the record that the vigilante groups even know of Mr. Agueda or that they would be interested in Mr. Agueda. So that is why substantial evidence supports the agency's decision. And Mr. Agueda is unable to show that the decision was not reasonable. He's unable to meet his burden to show that no reasonable adjudicator could have denied his claim. I'd like to briefly return to the presumption of regularity in administrative proceedings because I do think it is a key part of this. Again, the government acknowledges that the vigilante group is not expressly noted in the decision. And as my colleague and I both said today, there's no need to parse out every claim or every piece of evidence. This Court can take full confidence, though, in the application of the presumption of regularity in this case because the immigration judge did so consider the country condition report. He did understand the core principles of Mr. Agueda's claim and analyzed it under a holistic, totalitary of the circumstances approach in determining that Mr. Agueda didn't meet his burden. He failed to show that there was a clear probability of harm in El Salvador at the hands of any actor. Just with your one minute remaining, would you address the argument, perhaps your colleague on the other side will on rebuttal, of the whether there is a difference between the standards, someone in their particular circumstances is more likely than not to be tortured, and whether a respondent himself will be a target for harm? Is there any difference between those two standards? Your Honor, as this Court knows, the short answer is there is a difference. However, the immigration judge recited the proper standard, and this Court reviews the immigration judge's decision as modified by the boards, and the board also applied the correct standard. It's very clear that this is an oral decision. But is there a difference? I mean, is there any difference between those two standards? Do you think there is a difference? Let's say that they had not used the language in his particular circumstances, and they had said that respondent himself will be a target for harm. Let's say they had only said that. In your view, would that actually be any different in any substantive way from the language that was used in Mu Xing Wang? Your Honor, I definitely understand the question. No. You know, from my reading of Wang from Lin, from the government's perspective, there is no difference, and to use the most inflammatory language possible, I don't think that himself infects the decision or the analysis. That is very clear in the case law of the circuit and the board, that they regularly evaluate particular alleged circumstances. And a key part of that is how does the individual, him or herself, sit? Someone similarly sits? It's like social group kind of things, to understand if they fit within the category of a social group that suffers from some form of discrimination. But when one talks of his particular circumstances, it begins to sound more and more like requiring proof as to he, that individual himself, if you'll pardon me for affecting my question, particularized as to him in terms of like a prediction as to he himself as opposed to people that fit within the group. It's inartful in a way. The problem is that with language, it has this kind of a language of rules, has this ability to expand itself. So we're agreed on the standard, are we not? That we're not talking about some kind of guarantee that he himself will be, but it's more likely than not that people sharing his characteristics are more likely to be injured or tortured when they return, correct? Yes, Your Honor. That's correct. The standard should convey that as opposed to perhaps being misunderstood to be particularized as to him as a prediction for he himself. That's correct, Your Honor. But the spirit and substance of the immigration judge's decision as affirmed by the board makes it clear that he did analyze it in that context. And I realize that I'm over time, but with the court's indulgence, the immigration judge recited the proper standard throughout his decision, specifically starting at AR-62. There are other areas in the decision where he cites the correct standard, no doubt. And indeed, some of our decisions have cited the incorrect standard. That's correct, Your Honor. And indeed, that'd be the incorrect standard. It's correct. However, just to conclude, it is the spirit of the immigration judge's decision that this court reviews, and it's very clear that the immigration judge understood Mr. Agueda's claim fully and that he gave each portion, each element of his claim the full consideration that it deserved. Let me ask you one last question. This was expedited and no state is granted. Is he still stateside? Yes, Your Honor. He is still stateside. Is he still detained? He is still detained, yes, Your Honor. And therefore, the government asks that the court deny the petition for review and vacate the state of removal. Okay. Oh, there is a state. I didn't know that. Yes, there is. Oh, I thought there was. I didn't think there was. I apologize. I misunderstood. I'm sorry, then. I misheard you. All right.  Okay. Judge Robinson, did you have any further questions for Mr. Ross? No. Okay. Thank you very much. Thank you very much, Your Honor. And why don't we hear from Mr. Peng. Mr. Peng, you have reserved two minutes for rebuttal. All right. Thank you, Your Honor. I'd like to start by where we left off, which is this discussion about the spirit and substance of the IJ's decision. I think, yes, the IJ has perhaps a presumption of regularity. But with that presumption, I think there's often an expectation he's the expert in the room. And so for him to kind of, again, my colleague says, infect the decision with this reference      And I think that's a good point. And I think that's a good point. And I think that's a good point. the totality of my particular circumstances? I guess unless I'm going around with a conjoined twin. I don't understand. What is the difference? I certainly acknowledge that. I think the problem is, in that part of the assessment, the IJ says, absent specific evidence and Mr. Argueta himself would be targeted for torture. And this, I think, relates to Mr. Argueta's burden. And so I think the IJ suggested you need to show me there's perhaps a government official saying, you, Mr. Argueta, I seek to torture you. But that seems like that's a burden. That seems like it's a standard of proof. Or in terms of, you know, beyond a reasonable doubt, as opposed to a clear convincing evidence, as opposed to, you know, probability. That seems like it's a probabilistic question that you're saying they raise the percentage to high, as opposed to whatever the percentage might be. They focused on too narrow a group, meaning the group of you. And that's what I, aren't those two distinct issues? And I hear you saying, well, you wanted proof that some official said I'm going to get you. Well, that seems to be an argument that the IJ was requiring certainty, not mere more likely than not. How is it that different, though, from who was more likely than not to be tortured? Right. And again, I think part of it, in my mind at least, is the IJ announces his opinion in that form. To say, absent you showing me that you yourself will be targeted for torture. Would he say will be targeted? Yes. I think this is at 69 page 3, I believe, of the IJ opinion. He says, absent specific evidence, you respondent or Mr. Argueta himself will be a target of torture. Then I can't kind of grant this case. And I think that is a heightened standard beyond what the implementing regulations require. So you're focusing not so much on the respondent himself will be a target, so much as the absent specific evidence language? I think it's two taken together, right? Because again, I think the judge is saying, if you don't provide me this specific evidence that you yourself will be tortured, I can't grant this case. But he didn't say to a moral certainty. I mean, he stated the level of certainty, I think, consistently here, right? I can't see where it is, but it's more likely than not. On page 3, more likely than not. Right. So in terms of the level of probabilistic certainty, he was consistent. So that's what I don't understand. Are you arguing that he demanded a higher level of certainty or a higher level of specificity as to who? I think it's the latter. It's the specificity. I think it's the IJ saying, I need this specific form of evidence, which is specific evidence that you yourself will be tortured, or else I can't grant this case. As opposed to the fact that he was a former member of MS-13, and a large number of MS-13 people who returned to El Salvador faced torture. Right. Someone in those specific circumstances. He wanted something more specific than that, is your argument. That's how I read the judge's opinion. And he seemed to be, that's, I mean, we'll take a look at it. I want to go back and revisit. But you read from what he said? I'm sorry? You read from what he said? I did. Okay, fair enough. And you're talking, yeah. It's a short opinion, but I think you were reading from like pages 3 and 4, right? Yeah. If I could just briefly turn to... Why don't you take, why don't you wrap it up, and we've kept you up past your red light, but why don't you give us 30 seconds, give us a wrap up. Okay, 30 seconds. I point the court first to CAR 186. This is the State Department's own report that says extrajudicial killings are committed by security forces themselves. So I think the characterization of vigilante group is a little beyond what's shown in the evidence. I think to wrap up is, again, we are talking about legal evidence. This is not, we're not really ripe for substantial evidence review because we don't have starting points. The judge didn't make specific findings of fact. I think these are stark omissions when, for example, right now in contemporary times, the president of El Salvador has said, I will target gang members. I don't care if there are false positives. I want to wrap them all up. And then he's also articulating he wants to deny food to them while they're in prison. I think that is a stark omission to not address whether or not the Salvadoran government official has an intent to target and not protect those that are suspected to be gang members. Thank you, Your Honor. Thank you very much. And thank you to both of you. Very helpful oral arguments. We will reserve decision on this as on the other cases. I will note that we have one other case on the calendar today, 20-2254, United States of America v. Saleh. We will take that on submission. And having reserved decision on all the cases, we will stand adjourned. Court is adjourned.